UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

GWYNETTA GITTENS, JERALD
THOMPSON, STEPHANIE LAWRENCE
and PRESTON TOWNS, an individual and
on behalf of all similarly situated individuals

       Plaintiffs,

v.                            Case No:  2:16-cv-412-FtM-99MRM

THE SCHOOL BOARD OF LEE
COUNTY, FLORIDA,

       Defendant.
_____/

**REPORT AND RECOMMENDATION**[1]

Pending before the Court is the Motion to Certify a Class Action Pursuant to Rule

23(B)(1) and (3) (Doc. 34) filed on November 14, 2016.[2]  Plaintiffs Gwynetta Gittens, Dr. Jerald

Thompson, Stephanie Lawrence, and Preston Towns (collectively "Plaintiffs") brought suit

against their employer, the School Board of Lee County, Florida, ("School District"), alleging

---

[1]  Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or
websites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that
hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other
websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the
services or products they provide on their websites.  Likewise, the Court has no agreements with
any of these third parties or their websites.  The Court accepts no responsibility for the
availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or
directs the user to some other site does not affect the opinion of the Court.

[2]  The Motion to Certify Class Action (Doc. 34) was filed prior to the operative Amended
Complaint (Doc. 39).  From a review of the Motion to Certify Class Action (Doc. 34), it appears
that Plaintiffs anticipated the filing of the Amended Complaint (Doc. 39) when they filed the
Motion.  This is evinced by Plaintiffs bringing the Motion to Certify Class on behalf of Gittens
and Towns and later amending the Complaint to add claims under Title VII and FCRA for them.
Thus, the Court finds that the Motion to Certify Class Action (Doc. 34) was not rendered moot
by the filing of the Amended Complaint.

that the School District discriminated against them on the basis of their race—*i.e.*, African-American.  (*Id.* at 1).  Plaintiffs move the Court for entry of an Order certifying a class.  Specifically, Plaintiffs claim that the School District "employs a selection process for promotion into assistant principal positions that discriminates against African-Americans . . . [and] this case centers upon the [School District's] unwritten policy, and followed practice, whereby African-Americans are not hired for assistant principal positions due to their race."  (*Id.*).  The School District filed a Response ([Doc. 44](#)) in opposition to the Motion to Certify a Class Action on January 23, 2017.  The Motion to Certify a Class Action ([Doc. 34](#)) was referred to the Undersigned for a Report and Recommendation on November 18, 2016.  For the reasons set forth herein, the Court respectfully recommends that the Motion to Certify a Class Action ([Doc. 34](#)) be **DENIED**.

## I.   Background

### A.   General Allegations

Plaintiffs allege that the School District is a political subdivision of the State of Florida and oversees the public school system in Lee County, Florida.  ([Doc. 39 at ¶ 6](#)).  Plaintiffs assert that they are African-Americans and current or former employees of the School District.  (*Id.* at ¶¶ 2-5, 16, 29, 39, 51).  Plaintiffs allege that they applied for various positions – including, but not limited to assistant principal positions – with the administration of the School Board and were not chosen for these positions.  (*Id.* at ¶¶ 19, 27, 32, 37, 42, 49, 72, 73).  Plaintiffs claim that the School District has a pattern and practice of refusing to hire well-qualified, African-American employees to administrative positions.  (*Id.* at ¶¶ 28, 38, 50, 75).  Plaintiffs assert the following claims.

**Count I** – Plaintiffs allege a violation of Title VII as to named Plaintiffs, claiming that Plaintiffs were employees of or applicants for employment with the School District.  (*Id.* at ¶ 85).[3]  Plaintiffs claim that the School District subjected them to unlawful racial discrimination.  (*Id.* at ¶ 87).  Plaintiffs contend that the School District has a "continuing series of related discriminatory acts and a systematic policy, pattern[,] and practice of discrimination . . . targeting the Plaintiffs based on their membership in a protected class, their race."  (*Id.* at ¶ 88).  Plaintiffs claim to have suffered damages, including but not limited to, a loss of employment opportunities, loss of income and benefits, humiliation, and mental and emotional distress.  (*Id.* at ¶ 89).

**Count II** – Plaintiffs allege a violation of the Florida Civil Rights Act as to all named Plaintiffs, claiming that the School District violated Plaintiffs' civil rights by subjecting them to unlawful racial discrimination.  (*Id.* at ¶ 95).  Plaintiffs contend that the School District has a policy, pattern, and practice of racial discrimination.  (*Id.* at ¶ 96).  Plaintiffs claim to suffer similar damages as alleged in Count I.  (*Id.* at ¶ 97).

**Count III** – Plaintiffs allege that the School District violated Plaintiffs' rights under 42 U.S.C. § 1981.  (*Id.* at ¶ 103).  Plaintiffs contend that by virtue of their race, namely African-American, they are members of a protected class.  (*Id.* at ¶ 100).  Plaintiffs allege that while acting under color of state law, the School District engaged in unlawful discriminatory employment practices, interfering with Plaintiffs' contractual rights because of their race.  (*Id.* at ¶ 103).  Plaintiffs claim that the School District intentionally acted with malice and reckless disregard as to Plaintiffs' rights under § 1981.  (*Id.* at ¶¶ 105, 110).  Plaintiffs contend that the

---

[3]  The statement that the named Plaintiffs "were employees *or applicants* for employment and [the School District] was their employer (*or prospective employer*)" appears inconsistent with the general allegation that the named Plaintiffs were employees of the School District.  (Compare Doc. 39 at ¶ 85 with *id.* at ¶¶ 2-5).

School District intentionally subjected Plaintiffs to unequal and discriminatory treatment in hiring for administrator positions.  (*Id.* at ¶ 106).  Plaintiffs claim to suffer similar damages as alleged in Count I.  (*Id.* at ¶ 112).

 **Count IV** – Plaintiffs bring class allegations under 42 U.S.C. § 1981 for race discrimination.  (*Id.* at ¶¶ 118, 121).  Plaintiffs claim that by virtue of their race, they are members of a protected class and bring this claim on behalf of all those similarly situated.  (*Id.* at ¶¶ 114, 116).  Plaintiffs contend that many African-Americans were employees or applicants for employment with the School District.  (*Id.* at ¶ 115).  Plaintiffs claim that despite their qualifications, Plaintiffs and those similarly situated suffered adverse employment actions in the form of discriminatory denials of their applications for employment as administrators in the School District based upon their race.  (*Id.* at ¶¶ 118-122).  Plaintiffs assert that while acting under color of state law, the School District engaged in unlawful employment practices prohibited by § 1981 by creating, condoning, and perpetuating a discriminatory work environment and interfering with African-Americans' contractual rights because of their race. (*Id.* at ¶¶ 123-125).  Plaintiffs allege that the School District acted intentionally, maliciously, and willfully in reckless disregard of African-Americans' rights.  (*Id.* at ¶¶ 126, 131).  Plaintiffs allege that they and putative class members suffered damages similar to those asserted in Count I.  (*See id.* at 133).

 **Count V** – Plaintiffs assert class action allegations under Title VII for race discrimination.  (*Id.* at ¶¶ 139-40).  Plaintiffs assert that they and others similarly situated were qualified for and sought administrative positions with the School District, but were denied these positions by the School District, discriminating against them based on their race.  (*Id.* at ¶¶ 136-43).  Plaintiffs claim that the School District's actions were willful and knowing.  (*Id.* at ¶ 144).

Plaintiffs allege that they and putative class members suffered damages similar to those asserted in Count I.  (*See id.* at ¶ 146).

### B.       Allegations as to Each of the Named Plaintiffs

#### 1.       Gwynetta Gittens

In her Declaration, Gwynetta Gittens states as follows.  (Doc. 34-1).  Ms. Gittens is African-American.  (*Id.* ¶ 3).  In 2003, she was hired initially as a substitute teacher by the School District and, later in 2004, she was hired as a full-time teacher.  (*Id.* at ¶ 4).  She was awarded the Golden Apple of Distinction Award six (6) times and was also a Golden Apple finalist several times.  (*Id.* at ¶ 5).  Ms. Gittens claims that she began applying for assistant principal positions in 2010, but was not afforded an interview while others were.  (*Id.* at ¶¶ 6, 8).  In 2013, Ms. Gittens was granted an interview for an assistant principal position, but received no communication after the interview.  (*Id.* at ¶ 10).

Ms. Gittens continued to apply for administrative positions, but she was told that she would not be considered for an assistant principal position because she allegedly "'had no follow through.'"  (*Id.* at ¶ 11).  The School District never hired Ms. Gittens for an administrative position despite her qualifications for such a post.  (*Id.* at ¶ 12).  Ms. Gittens claims that the School District employs practices that disadvantage African-Americans.  (*Id.*).

Further, Ms. Gittens claims that hiring statistics for April 2016 show that white employees comprised 83% (142 persons) of the Assistant Principal Pool ("AP Pool") whereas African-Americans comprised only 7% (12 persons) of the AP Pool.  (*Id.* at ¶ 14).  Ms. Gittens estimates that at least fifty (50) other African-American employees were denied an AP Pool position on multiple occasions.  (*Id.* at ¶ 16).  Ms. Gittens asserts that she will adequately

represent the interests of the unnamed class members, will vigorously prosecute this action with class counsel, and has no conflict of interest between the class and herself.  (*Id.* at ¶ 17).

### 2. Dr. Jerald Thompson

In his Declaration, Dr. Thompson states as follows.  (Doc. 34-2).  Dr. Thompson is African-American and he holds a doctorate degree.  (*Id.* at ¶ 3).  Dr. Thompson began applying for administrative positions – specifically, assistant principal positions – in 2011.  (*Id.* at ¶ 4). The School District did not afford him an interview.  (*Id.* at ¶ 5).  In 2013, the School District hired Dr. Thompson as a teacher.  (*Id.* at ¶ 6).  Dr. Thompson received three (3) interviews for principal positions in 2014, but he was not hired.  (*Id.* at ¶¶ 7-8).  Dr. Thompson continued to apply for administrative positions, but received no responses.  (*Id.* at ¶ 10).  Dr. Thompson claims that under-qualified, non-African-Americans were hired instead of him.  (*Id.*).

Dr. Thompson also provides the same statistics as Ms. Gittens regarding the April 2016 AP Pool position composition as well as the number of African-American employees denied AP Pool positions.  (*See id.* at ¶¶ 12, 14).  Dr. Thompson claims that the School District employs practices that disadvantage African-Americans.  (*Id.* at ¶ 11).  As with Ms. Gittens, Dr. Thompson asserts that he will adequately represent the interests of the unnamed class members, will vigorously prosecute this action with class counsel, and has no conflict of interest between the class and himself.  (*Id.* at ¶ 15).[4]

---

[4]  As discussed, *infra*, subsequent to the filing of the Motion to Certify Class, Dr. Thompson's counsel moved to withdraw from representation of Dr. Thompson.  (*See* Doc. 46).  Therefore, the assertions by Dr. Thompson that he will vigorously prosecute this action with class counsel may no longer be valid.

### 3.    Stephanie Lawrence

In her Declaration, Ms. Lawrence states as follows.  She is African-American and she was hired by the School District in 2007 as a teacher.  (Doc. 34-3 at ¶¶ 3-4).  Beginning in 2013, Ms. Lawrence began applying for administrative positions, specifically assistant principal positions.  (*Id.* at ¶ 5).  She was interviewed twice by all-white panels and was not selected for either position.  (*Id.*).  Instead, a white male was selected for one position and a white female for the other.  (*Id.*).  In 2014, Ms. Lawrence applied for administrative positions, specifically assistant principal positions, but she was not afforded an interview and these positions were filled with people outside of her protected class.  (*Id.* at ¶ 7).  Ms. Lawrence applied for a coordinator position in September 2014, but was not hired for that position or any administrative position with the School District.  (*Id.* at ¶ 9).  In late September 2014, Mr. Lawrence interviewed for another position, but was not hired for that position either.  (*Id.*).

Ms. Lawrence claims that the School District employs practices that disadvantage African-Americans.  (*Id.* at ¶ 10).  Further, Ms. Lawrence provides the same statistics as Ms. Gittens regarding the April 2016 AP Pool composition as well as the same number of African-American employees denied AP Pool positions.  (*See id.* at ¶¶ 11, 13).  As with Ms. Gittens, Ms. Lawrence asserts that she will adequately represent the interests of the unnamed class members, will vigorously prosecute this action with class counsel, and has no conflict of interest between the class and herself.  (*Id.* at ¶ 14).

### 4.    Preston Towns

In his Declaration, Preston Towns states as follows.  He is an African-American who holds a Masters Degree in Educational Leadership.  (Doc. 34-4 at ¶¶ 3, 4).  In 2006, Mr. Towns was hired as a teacher by the School District.  (*Id.* at ¶ 5).  On October 10, 2012, he was

promoted to the position of assistant principal by an African-American principal.  (*Id.*).  Later, Mr. Towns was transferred to a different school with a white principal.  (*Id.* at ¶ 6).  He claims that he was treated differently than other administrative staff, including learning from a colleague on August 20, 2013, that the principal and other administrators were having secret meetings to discuss him.  (*Id.*).

Mr. Towns was transferred to another school with another white principal.  (*Id.* at ¶ 7).  Mr. Towns claims that he was treated differently than other administrators at this school.  (*Id.*).  After complaining to Dr. Tim Ferguson on April 1, 2014, Mr. Towns was informed that his contract would not be renewed and that he would have to apply for vacant administrator positions.  (*Id.* at ¶ 8).  However, in May 2014, Mr. Towns was instead transferred to Dunbar Community School under the supervision of Mr. Charles Dailey, but was told he would be demoted to a teacher effective August 2014.  (*Id.* at ¶ 9).  In April 2015, Mr. Towns discovered that he had been removed from the AP Pool with no explanation, but was promised he would be re-added.  (*Id.* at ¶ 10).  Mr. Towns learned that the word "reject" was placed next to his name in the School District's database.  (*Id.* at ¶ 14).

Beginning in June 2015, Mr. Towns began applying again for administrative positions, specifically assistant principal positions in the School District.  (*Id.* at ¶ 14).  When he received interviews, the interviewers were outside his protected class and he was not selected for any of these positions.  (*Id.*).  Mr. Towns was never rehired for an administrative position.  (*Id.* at ¶ 15).  Mr. Towns claims that the School District employs practices that disadvantage African-Americans.  (*Id.* at ¶ 16).  Further, Mr. Towns provides the same statistics as Ms. Gittens regarding the April 2016 AP Pool composition as well as the same number of African-American employees denied AP Pool positions.  (*See id.* at ¶¶ 17, 19).  As with Ms. Gittens, Mr. Towns

asserts that he will adequately represent the interests of the unnamed class members, will vigorously prosecute this action with class counsel, and has no conflict of interest between the class and himself.  (*Id.* at ¶ 20).

###   C.   Hiring Process for Assistant Principals

Plaintiffs' claims call into question the School District's process for hiring assistant principals.  Therefore, a review of that process is instructive.  Chief Human Resources Office for the School District, Angela J. Pruitt, Ph.D. PMP, SHRM-CP, provided an Affidavit (Doc. 44-1) explaining the School District's process for hiring assistant principals.  Dr. Pruitt stated that to be considered for an assistant principal position, an applicant must first apply and be accepted into the AP Pool.  (*Id.* at ¶¶ 3, 4, 8).  Once accepted, then an individual may apply and be hired for a specific assistant principal position at a certain school.  (*Id.* at ¶ 8).

According to Dr. Pruitt, the AP Pool has three (3) phases:  (1) meeting the minimum requirements; (2) passing the assessments; and (3) passing the interview or interviews.  (*Id.* at ¶ 4).  In the first phase, Dr. Pruitt states that the minimum requirements for the AP Pool are:  (1) at least four years of teaching experience; (2) three years of effective and highly effective teacher ratings in all categories on annual performance reviews; (3) completion of a Master's Degree in Educational Leadership or its equivalent; (4) an Educational Leadership Certification; (5) a letter of recommendation from a current supervisor; and (6) a completed Principal Insight.  (*Id.* at ¶ 5).  In the second phase, Dr. Pruitt states that an applicant is required to complete a Florida Leadership Standards Reflection and pass a writing assessment.  (*Id.*).  Both the Florida Leadership Standards Reflection and the writing assessment are scored by 2-3 administrators on a rubric scale, and an applicant must score a 3.0 or higher to move on to the third phase.  (*Id.* at ¶ 6).  Dr. Pruitt asserts that an applicant's race is not disclosed to the administrators scoring the

assessments.  (*Id.*).  For the third and final phase, Dr. Pruitt maintains that each interview team

has two to four interviewers comprised of district-level administrators and school-based

administrators from the elementary, middle, and high school levels.  (*Id.* at ¶ 7).  Dr. Pruitt states

that the interview teams are selected for each "round" of applicants to the AP Pool and, while

some of the interviewers may be the same if an applicant applies multiple times, it is "very

unlikely" that an applicant would "ever encounter the same exact team of interviewers."  (*Id.*).

After acceptance into the AP Pool – which is handled at the District level – an applicant

must then apply to an open assistant principal position.  (*See id.* at ¶ 8).  Actual hiring is handled

by the specific school that has the opening.  (*Id.* at ¶ 8).  Dr. Pruitt states that each individual

school advertises its open assistant principal positions, screens the applicants, conducts its own

interviews and, when selected by the Principal of that specific school, the candidate's name is

submitted to the Superintendent, who then sends it to the School Board for final approval.  (*Id.*).

## II.   Analysis

### A.   Rule 23(a) Requirements

A class action is "an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348,

(2011) (quotation and citation omitted).  To justify a departure from that rule, a class

representative must be a part of the class and possess the same interests and suffer the same

injuries as the class members.  *Id.*  The requirements of Rule 23(a) ensure that named plaintiffs

are appropriate representatives of the class they wish to litigate.  *Id.*  "The Rule's four

requirements – numerosity, commonality, typicality, and adequate representation – 'effectively

limit the class claims to those fairly encompassed by the named plaintiff's claims.'"  *Id.* (citing

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).  The question of whether to certify a

class rests in the sound discretion of the district court.  *Rosario-Guerrro v. Orange Blossom Harvesting*, 265 F.R.D. 619, 624 (M.D. Fla. 2010) (citing *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1189 (11th Cir. 2009)).  The party moving for class certification has the burden to establish all implicit and explicit requirements of Rule 23.  *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014); *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).

Rule 23 does not establish a mere pleading standard.  *Dukes*, 564 U.S. at 350.  "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.  We recognized in *Falcon* that 'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'"  *Id.* at 351-51.  The trial court must conduct a "rigorous" analysis of the prerequisites Rule 23(a) requirements that may overlap with the merits of plaintiffs' underlying claim.  *Id.* at 351.  "The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Id.* (citing *Falcon*, 457 U.S. at 157).

Specifically, Rule 23(a) requires:

(1)    the class is so numerous that joinder of all members is impracticable;
(2)    there are questions of law or fact common to the class;
(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These four prerequisites are "'designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims.'"  *Valley Drug Co.*, 350 F.3d at 1188 (quoting *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000)).  If the party fails to establish any one of these four factors, then the party is precluded from class

certification.  *Id.*  Once all of the requirements of Rule 23(a) are met, then the party must satisfy

one of the requirements of Rule 23(b).  *Id.*

### 1.  Standing

As a threshold matter, Plaintiffs must have standing pursuant to Article III to raise each

class claim.  *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1321 (11th Cir. 2008).  Defendants do

not appear to seriously challenge the Plaintiffs' standing.  Accordingly, the Court need not

address it in detail here.  The Court notes, however, that these Plaintiffs each allege that they

were employees of the School District, were members of a protected class, applied for

administrative positions and, due to the alleged unlawful and discriminatory practices of the

School District, they were not hired for certain administrative positions.  (Doc. 39 at ¶¶ 16-82).

These allegations appear sufficient to afford Plaintiffs standing to pursue claims for violations of

42 U.S.C. § 1981 (Count IV) and Title VII (Count V) as to race discrimination.[5]

### 2.  Class Definition and Ascertainability

Another threshold consideration is that Plaintiffs must demonstrate that the proposed

class is adequately defined and clearly ascertainable.  *Bussey*, 562 F. App'x at 787.  "An

identifiable class exists if its members can be ascertained by reference to objective criteria" and

the objective criteria is administratively feasible.  *Id.* (quotation omitted).  "Administrative

feasibility means that identifying class members is a manageable process that does not require

---

[5]  In the Motion to Certify a Class Action, the named Plaintiffs seek to certify a class under the
Florida Civil Rights Act.  (*See, e.g.*, Doc. 34 at 19).  However, the Florida Civil Rights Act claim
in Count II appears on its face to raise individual claims only.  (*See* Doc. 39 at 14-15).  Thus,
absent a claim containing class action allegations under the Florida Civil Rights Act in the
Amended Complaint, the Court recommends that a class not be certified under the Florida Civil
Rights Act.  Moreover, even if the Amended Complaint contained a claim for class certification
under the Florida Civil Rights Act, this claim would fail under Rule 23(a) and (b) for the same
reasons as the Title VII and § 1981 claims fail.

much, if any, individual inquiry." *Id.* (quotations omitted).  A court should deny class certification when the class definition is "overly broad, amorphous, and vague, or where the number of individualized determinations required to determine class membership becomes too administratively difficult."  *Kirts v. Green Bullion Fin. Servs., LLC*, No. 10-20312-CIV, 2010 WL 3184382, at *6 (S.D. Fla. Aug. 3, 2010).  After a plaintiff satisfies this threshold issue, then the district court must conduct a rigorous analysis of the Rule 23 prerequisites.  *Bussey*, 562 F. App'x at 787 (citations omitted).

Here, Plaintiffs seek to certify a class defined as follows:

> Any and all black/African-American employees who applied for an AP Pool position in the four years preceding this action but who were denied such a position by Defendant.

(Doc. 34 at 7).[6]  At first blush, the class definition would appear to be fairly precise.  However, consideration of the School District's procedures reveals the class definition to be highly problematic.  The problem stems from inclusion of the language "who applied for an AP Pool position" and "who were denied such a position," when that language is considered in light of the School District's multi-step application process for assistant principals.

Specifically, the language used in the putative class definition is subject to at least two interpretations, making it infeasible to ascertain class membership.  On the one hand, the class definition can be read to include African-American employees who (1) applied for (2) a position *in the AP Pool* and (3) were denied a position *in the AP Pool*.  On the other hand, the class definition can also be read to include African-American employees already in the AP Pool who (1) applied for (2) an *assistant principal position* and (3) were denied *an assistant principal*

---

[6]  The Amended Complaint (Doc. 39) fails to include a class definition.  The class definition is provided in the Motion to Certify a Class (Doc. 34 at 7).

*position*.  The plain language of the class definition would tend to support the former reading, but the facts and circumstances of the named Plaintiffs' individual claims tend to suggest the latter reading was intended.  As a result, it is not at all clear whether the putative class definition includes African-American employees of the School District who applied for and were accepted *into the AP Pool*, but who subsequently applied for and were denied *assistant principal positions* in the School District's multi-step process for selecting assistant principals.[7]

Plaintiffs' class certification motion (Doc. 34) does not expressly resolve this ambiguity because the motion either ignores, confuses, or conflates this distinction when describing the proposed class.  (*See, e.g.*, "African-American employees were denied an AP Pool position," (Doc. 34 at 7); "Defendant discriminates based upon race in the promotion to the AP Pool position," (*id.* at 8); "putative class members were denied AP Pool positions," (*id.* at11); and "the common issue applies to all African-American applicants for the AP Pool," (*id.* at 19)).

The vague, ambiguous, and amorphous nature of the class definition is not without material consequence.  It makes it infeasible to determine who the class member are.  It is also potentially fatal to the named Plaintiffs' bid for class certification because – depending on how the class definition is interpreted – potentially *all* of the named Plaintiffs would be excluded from the putative class.  For example, according to Dr. Pruitt's affidavit, Mr. Towns and Ms. Gittens were actually accepted *into the AP Pool* from May 27, 2012 to May 27, 2016, and Dr. Thompson was also accepted *into the AP Pool* in October 2016.  (*See* Doc. 44-1).  Thus, these

---

[7]  As an alternative reading, the class definition could include African-American employees who were never members of the AP Pool, but who applied for assistant principal positions and were denied those positions.  Even though Stephanie Lawrence appears to meet the requirements for this class definition, this class definition seems utterly unworkable because it runs afoul of the School District's requirements for eligibility to be hired as an assistant principal.  (*See* Doc. 44-1 at ¶¶ 3, 11).

named Plaintiffs could not be members of a class limited to persons denied a position *in the AP Pool*. Moreover, Ms. Lawrence never applied to be a member of the AP Pool. (Doc. 44-1 at ¶ 11).[8] She could not, therefore, be a member of any putative class where membership requires that the person have applied to the AP Pool in the first instance. Thus, if the class definition is read as being limited to African-American employees who (1) applied for a position *in the AP Pool* and (2) were denied a position *in the AP Pool*, then none of the named Plaintiffs would be class members. (*See* Doc. 34 at 7).

Alternatively, if the class definition is read to include African-American employees who applied for and were accepted into the AP Pool, but were later not selected to fill an assistant principal position, then Ms. Gittens, Dr. Thompson, and Mr. Towns would be members of the putative class and, at least arguably, would have suffered injuries similar to other members of the proposed class. However, any such reading of the class definition would still exclude Ms. Lawrence who, according to the uncontroverted evidence of record, never applied for an AP Pool position and, therefore, was not eligible for an assistant principal job. (*See* Doc. 44-1 at ¶ 11).

Based on the foregoing, the proposed class definition here fails – as it is currently written – because it is impermissibly vague, ambiguous, and amorphous such that the putative class membership is not ascertainable. Class certification should be denied for that reason alone.

The Court will nevertheless continue with its analysis of the other class certification requirements under Fed. R. Civ. P. 23, assuming *arguendo* that the class definition is reformulated to include:

> Any and all black/African-American employees of the School District who applied
> for and were accepted into the Assistant Principal Pool (the "AP Pool") and,

---

[8] The named Plaintiffs' Declarations were unclear as to whether they were members of the AP Pool. (*See*, *e.g.*, Doc. 34-1 at ¶¶ 8, 10, 11; Doc. 34-2 at ¶¶ 4, 7, 10; Doc. 34-3 at ¶¶ 5, 7; Doc. 34-4 at ¶¶ 5, 14, 15). Thus, the Court relies on Dr. Pruitt's uncontroverted Affidavit on this point.

subsequently, in the four years preceding this action also applied for but were denied an assistant principal position by Defendant.

This revised class definition eliminates the vagueness and ambiguity that haunt the Plaintiffs' originally proposed class definition, while taking into account the School District's process for hiring assistant principals from the AP Pool.  Further, this revised class definition would place more of the named Plaintiffs within the class than not.  Utilizing this reformulated class definition, the Court addresses each of the Rule 23(a) prerequisites in turn below.

### 3.    Numerosity

To certify a class, Rule 23(a) requires that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The plaintiff bears the burden of making some showing, albeit a "generally low hurdle," of "affording the district court the means to make a supported factual finding that the class actually certified meets the numerosity requirement." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009); *Schojan v. Papa Johns Int'l, Inc.*, 303 F.R.D. 659, 664 (M.D. Fla. 2014).  Although the mere allegation of numerosity is insufficient, the plaintiff need not show a precise number of members for the putative class and, further, the rule imposes a "generally low hurdle." *Vega*, 564 F.3d at 1267.  In dicta, the Eleventh Circuit has held, "while there is no fixed numerosity rule, 'generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.'" *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (citation omitted).

To meet this requirement, Plaintiffs contend that the potential class is at least fifty (50) people and, thus, the numerosity requirement is easily satisfied.  (Doc. 34 at 11).  Each named Plaintiff avers in his or her declaration that at least fifty (50) other African-American employees of the School District were denied an AP Pool position on the basis of the Defendant's alleged

policy challenged by this lawsuit.  (*See* Doc. 34-1 at ¶ 16; 34-2 at ¶ 14; Doc. 34-3 at ¶ 13; 34-4 at

¶ 19).  For the reasons explained above, the Court construes this attestation to mean that at least

fifty (50) other African-American employees of the School District applied for and were

admitted to the AP Pool, and subsequently also applied for but were denied an assistant principal

position by Defendant.

For its part, the School District does not challenge numerosity even though the School

District does not believe that Plaintiffs have met their burden with respect to the numerosity

requirement.  (Doc. 44 at 10).  According to the School District's preliminary statistics during

the relevant time period, potentially seventy-two (72) African-American employees applied for

open assistant principal positions in the School District.  (*See id.*; Doc. 44-1 at ¶¶ 9-10).  Of

those applicants, twelve (12) African-American employees were hired.  (*Id.*).

Even though the School District does not challenge numerosity, a court has the

responsibility "of conducting its own inquiry as to whether the requirements of Rule 23 have

been satisfied in a particular case."  *Valley Drug Co.*, 350 F.3d at 1188.  Both parties provide

statistical information demonstrating different aspects of the assistant principal hiring process,

including the composition of the AP Pool, the number of open assistant principal positions, the

ethnicity of the applicants, and the ethnicity of those hired.  (*See* Doc. 34-3 at 6; Doc. 44-1 at 3-

4).  Based upon this record evidence, the Court finds that the numerosity requirement is amply

satisfied.

### 4.    Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed.

R. Civ. P. 23(a)(2).  Commonality refers to the characteristics of the class as a whole, unlike

typicality, which refers to the individual characteristics of plaintiffs in relation to the class.

*Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (citing *Prado-Steiman*, 221 F.3d at 1279).  Commonality requires that there be some factual or legal theory that is susceptible to class-wide proof.  *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009).  It also requires that "there be at least one issue whose resolution will affect all or a significant number of the putative class members."  *Williams*, 568 F.3d at 1355 (citation and quotation omitted).  Commonality may be satisfied "even with some factual variations among class members."  *Schojan*, 303 F.R.D. at 665.

In the watershed case of *Wal-Mart Stores, Inc. v. Dukes*, the United States Supreme Court clarified the commonality requirement under Fed. R. Civ. P. 23 by specifically rejecting the use of generalized questions to establish commonality.  564 U.S. at 349.  In *Dukes*, female employees of a retail store chain brought a class action under Title VII against their employer alleging sex discrimination.  *Id.* at 343.  The district court certified the class and the Ninth Circuit Court of Appeals substantially affirmed.  *Id.* at 338.  The Supreme Court reversed, holding that certification of the class was not consistent with Fed. R. Civ. P. 23(a).  *Id.* at 367.  The Supreme Court stated that "[i]n order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Id.* at 348-49.

Noting that any "competently crafted class action complaint literally raises common questions," the Supreme Court focused its inquiry as follows:

> This does not mean merely that they have all suffered a violation of the same
> provision of law.  Title VII, for example, can be violated in many ways – by
> intentional discrimination, or by hiring and promotion criteria that result in
> disparate impact, and by the use of these practices on the part of many different
> superiors in a single company.  Quite obviously, the mere claim by employees of
> the same company that they have suffered a Title VII injury, or even a disparate-
> impact Title VII injury, gives no cause to believe that all their claims can
> productively be litigated at once.  Their claims must depend upon a common

> contention – for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution – *which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke*.

*Id.* at 350 (emphasis added). Importantly, the Supreme Court held that: "[w]hat matters to class certification . . . is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* at 351 (citation omitted).

Here, as in *Dukes*, the claims raised involve employees suffering from alleged discrimination. Further, as in *Dukes*, the proof of commonality overlaps with Plaintiffs' merits contention that the School District engages in a pattern or practice of discrimination. *Id.* at 352. The Supreme Court found that this overlap exists because when resolving an individual's Title VII claim, the "crux of the inquiry is 'the reason for a particular employment decision.'" *Id.* (citation omitted). Similar to *Dukes*, the Plaintiffs here wish to bring suit calling into question a relatively large number of employment decisions at once. *See id.* "Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* (emphasis in original).

Plaintiffs argue that the following questions of law or fact are common to the class:

(1)   "the putative class members were denied AP Pool positions because of the Defendant's policies that discriminate against African-Americans;"

(2)   "class members are subject to the same policies and [,] thus[,] share the same kind of damages as the Plaintiffs, to wit:  the Defendant's policies denying African-American applicants AP Pool positions on the basis of their race;" and

(3)    "[t]his is a common or standardized policy and practice[] of the Defendant
that is in plain violation of Title VII, § 1981 (via § 1983) and the FRCA."[9]

(Doc. 34 at 11-12).

This Court is tasked with determining whether these alleged common questions of law or

fact are sufficient to satisfy the commonality requirement, keeping in mind that any

"competently crafted class action complaint" will appear to satisfy this prerequisite.  *Dukes*, 564

U.S. at 350.  Again, consideration of the School District's multi-step process for selecting

assistant principals is highly instructive.  Once accepted into the AP Pool, an applicant must

apply for an open assistant principal position.  The actual hiring for open assistant principal

positions is handled by each individual school that has an opening.  (Doc. 44-1 at ¶ 8).  Each

school individually advertises its open assistant principal position, screens the applicants, and

conducts its own interviews.  (*Id.*).  After the interview process is complete, the principal of the

school selects his or her top candidate and provides this name to the Superintendent, who sends

the candidate's name to the School Board for final approval.  (*Id.*).

This multi-step process demonstrates that the School District gives each school and each

school's principal a level of discretion in selecting assistant principal applicants from the AP

Pool.  The exercise of such discretion by schools and principals over time at different schools

where open assistant principal positions arise precludes a finding of commonality.  *See Dukes*,

564 U.S. at 355.  "On its face, of course, [a policy allowing discretion in hiring] is just the

---

[9]  The named Plaintiffs again raise the issue of certifying a class under the Florida Civil Rights
Act.  (*See* Doc. 34 at 12).  As stated in footnote 5 *supra*, Plaintiffs failed to allege a class action
claim under the Florida Civil Rights Act.  (*See* Doc. 39 at 14-15).  Again, even if the Amended
Complaint contained a claim for class certification under the FCRA, this claim would fail under
Rule 23(a) for the same reasons as the Title VII and § 1981 claims fail.

opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices." *Id.*  In other words, the same person is not alleged to make the assistant principal hiring decision relative to each and every member of the putative class here.  Rather, different principals make their selections at each of the different schools within the School District where vice principal positions become available.  Consequently, in this case, proof of unlawful discrimination by any principal when making a discretionary selection will not prove that every other principal at other schools similarly discriminated against other vice principal candidates from the AP Pool.  *See id.* at 355. Stated differently, where individual principals exercise discretion in selecting vice principal candidates, there cannot be sufficiently common *answers* to the question of why any named Plaintiff or any putative class member was not selected for the job.  A classwide proceeding in this case would not have the capacity to generate common answers apt to drive the resolution of the litigation for each named Plaintiff and each individual class member.

Moreover, "actual hiring for open Assistant Principal positions is handled by the school that has the opening [and] [e]ach school advertises its open Assistant Principal positions, screens the applicants, and conducts its own interviews."  (Doc. 44-1 at ¶ 8).  Similarly, each individual candidate has different qualifications and experiences as evinced by the varying qualifications of Plaintiffs as to their education, teaching experience, and other activities.  (*See, e.g.*, Doc. 34-1 at ¶¶ 4, 5, 9; 34-2 at ¶¶ 3, 6).  Thus, proof that any person was denied an assistant principal position because of race would not prove that every other assistant principal applicant who was vetted through a differently managed process at the individual school level was also discriminated against unlawfully.  *See Dukes*, 564 U.S. at 355.  Accordingly, Plaintiffs have not met their

burden to show that there are common answers to the question of why any named Plaintiff or putative class member was denied an assistant principal position.  *See id.* at 352.

Further, the Amended Complaint contains vague references to disparate treatment.  (*See* Doc. 39 at ¶¶ 58, 62, 81).[10]  The Court examines these allegations at this time only insofar as they inform the class certification analysis under Fed. R. Civ. P. 23.  "Because disparate treatment claims are by their very nature individual, the class treatment of these claims requires close scrutiny of the proposed class and their claims."  *Wright v. Circuit City Stores, Inc.*, 201 F.R.D. 526, 539 (N.D. Ala. 2001) (citing *Zachery v. Texaco Exploration and Production, Inc.*, 185 F.R.D. 230, 239 (W.D. Tex. 1990)).

To establish a pattern or practice of disparate treatment, the plaintiff must show intentional discrimination by the employer was a standard operating procedure.  *Cooper v. S. Co.*, 390 F.3d 695, 716 (11th Cir. 2004), *overturned on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).  To prove this type of discrimination, the plaintiff may use anecdotes and strong statistical evidence.  *Id.*; *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1287 (11th Cir. 2000); *Bryant v. Southland Tube*, 294 F.R.D. 633, 646-647 (N.D. Ala. 2013). Plaintiffs' declarations fail to provide specific anecdotes in support of their disparate treatment claims and the claims of putative class members.  For example, none of Plaintiffs' declarations provide any specific anecdotal information concerning which assistant principal positions were open, the names of the schools, where and when Plaintiffs actually applied, which principals made the ultimate selections, who else applied for the opening, the qualifications of other candidates, the qualifications of the persons ultimately selected for the assistant principal positions, etc.  Rather than specific anecdotal information, Plaintiffs merely provide conclusory

_____

[10]  Plaintiffs do not expressly allege or argue a disparate impact theory in this case.

and vague statements that they were qualified for positions, applied, and were not selected due to their race.  (*See*, *e.g.*, Doc. 34-1 at ¶¶ 10-12).  Additionally, Plaintiffs' statistical information consists of a limited snapshot taken from April 2016 concerning the racial composition of the AP Pool positions at that limited point in time.  (*See, e.g.*, *id.* at ¶ 14).  This statistical information is not strong.[11]  Accordingly, the Court finds that Plaintiffs' disparate treatment allegations do not overcome the individualized nature of the claims asserted.

Contrary to Plaintiffs' position, the record fails to establish common contentions of such a nature that they are capable of classwide resolution.  *See Dukes*, 564 U.S. at 350.  Stated differently, Plaintiffs fail to provide the necessary glue to hold the putative class claims together under a commonality analysis.  *See id.* at 352.  For the foregoing reasons, the Court finds that Plaintiffs fail to establish the prerequisite of commonality.

### 5.    Typicality

Rule 23(a) also requires that "the claim or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3). . . . [T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large."  *Cooper*, 390 F.3d at 713 (quoting *Prado-Steiman*, 221 F.3d at 1279).  Traditionally, commonality refers to the group characteristics of the class as a whole, whereas typicality refers to the individual characteristics of plaintiffs in relation to the class.  *Id.*  All putative class members are not required to share

---

[11]  Defendants provide some additional statistical information reflecting the ethnicity of unique assistant principal applicants, including those who were ultimately hired, within the District from the time period May 27, 2012 and May 27, 2016.  (Doc. 44-1 at ¶¶ 9-10).  This information by itself does not constitute strong statistical evidence of a pattern or practice of disparate treatment of African-American applicants.

identical claims, and factual differences among the claims of the putative class do no defeat
certification.  *Id.* (citation omitted).  Nonetheless, Plaintiffs' claims must share the same
"essential characteristics as the claims of the class at large."  *Id.* (citations omitted).  "The claim
of a class representative is typical if the claims or defenses of the class and the class
representative arise from the same event or pattern or practice and are based on the same legal
theory."  *Williams*, 568 F.3d at 1357 (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d
1332, 1337 (11th Cir. 1984)).  "Thus, typicality is often met when, in proving her case, the
representative plaintiff establishes the elements needed to prove the class members' case."
*Colomar v. Mercy Hosp., Inc.*, 242 F.R.D. 671, 677 (S.D. Fla. 2007).

    Here, Plaintiffs fail to establish the typicality requirement.  To begin with, Ms.
Lawrence's claim cannot be typical of a class of persons who applied for and were denied
assistant principal positions because, based on the uncontroverted record evidence presented to
the Court, Ms. Lawrence never applied for an AP Pool position and, therefore, was not eligible
for an assistant principal job.  (*See* Doc. 44-1 at ¶ 11).  Ms. Lawrence's declaration does not state
that she applied to be in the AP Pool or was accepted into the AP Pool.  (*See* Doc. 34-3).
Defendants certainly have a unique defense to Ms. Lawrence's claim on these grounds, rendering
her claim atypical of the other putative class members' claims.

    Additionally, Mr. Towns' claims are atypical of a class of persons who applied for and
were denied assistant principal positions because he was actually promoted to the position of
assistant principal on or about October 10, 2012 and appears to have held that position until
August 2014 when he was demoted to a teacher position.  (Doc. 34-4 at ¶¶ 5-9).  Thereafter, Mr.
Towns was removed from the AP Pool, but was promised that he would be re-added.  (*Id.* at ¶
10).  He then began re-applying for assistant principal positions, but was not selected.  (*Id.*at ¶

14).  It is clear from these allegations that Mr. Towns' individual claims include a complaint about his prior transfers, his demotion, and his removal from the AP Pool.  (*See* Doc. 39 at ¶¶ 51-75).  In seeking to prove these matters as part of his claim, Mr. Towns will not necessarily advance the claims of other putative class members who were never hired into an assistant principal position in the first place.  Moreover, it is also clear from these allegations that Defendant is likely to advance unique defenses to Mr. Towns' claims relating to his inability to be re-hired to an assistant principal position based on his unique employment history with the Defendant.

The named Plaintiffs also fail the typicality requirement because each individual school advertised its opening for an assistant principal position and had its own decision-maker screening applicants and conducting interviews before the school principal selected the top applicant.  (Doc. 44-1 at ¶ 8).  For each job opening, therefore, there were different decision-makers involved, different faculties, and different schools with a variety of needs.  *Id.*  Similarly, each individual candidate for a position possessed different qualifications as shown by the wide variety of Plaintiffs' respective qualifications, including their education and professional experience.  (*See, e.g.,* Doc. 34-1 at ¶¶ 4, 5, 9; Doc. 34-2 at ¶¶ 3, 6).  Although the named representatives and the putative class members are not required to share factually identical claims, they nonetheless must share the same essential characteristics as the claims of the class at large.  *Cooper*, 390 F.3d at 713.  Here, Plaintiffs have not met their burden to show that their claims are based on the same event, pattern, or practice as the claims of other putative class members.  Accordingly, the Court finds that Plaintiffs fail to establish the typicality requirement.

### 6.      Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This requirement applies equally to the class representatives and counsel.  *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003).  The adequacy of representation requirement encompasses two separate inquiries:  (1) whether there are substantial conflicts of interest between the named representatives of the class and the class members; and (2) whether the representatives will adequately prosecute the action. *Valley Drug Co.*, 350 F.3d at 1189.  If substantial conflicts exist between the class representatives and the putative class members, then class certification is inappropriate.  *Id.* Minor conflicts alone will not defeat a party's claim for class certification, the conflict must be fundamental.  *Id.*

While the School District opposes class certification on other grounds, it does not object to counsel's qualifications and ability to represent a potential class, nor does the School District dispute that, at this stage in the litigation, the representative parties' adequacy to represent the class.  (Doc. 44 at 14-15).  Nevertheless, the Court finds that there are two issues that preclude finding named Plaintiffs Stephanie Lawrence and Dr. Jerald Thompson adequate to represent the proposed class.

As explained above, Ms. Lawrence never applied for an AP Pool position and, therefore, was not eligible for an assistant principal job.  (*See* Doc. 44-1 at ¶ 11).  She cannot, therefore, adequately represent a putative class of employees of which she is not a member.

Dr. Thompson presents a wholly different adequacy concern.  After the class certification briefing was fully submitted, Plaintiffs' counsel, Benjamin Yormak, filed a Notice of Intent to Withdraw (Doc. 45) and an Unopposed Motion to Withdraw as Counsel for Dr. Thompson (Doc.

46).  Mr. Yormak seeks leave to withdraw as counsel of record for Dr. Thompson only.  (Doc. 46 at 1).  The only ground cited for the requested withdrawal is "a breakdown in the attorney-client relationship."  (*Id.*).  Without more information, the Court is unable to determine whether a genuine potential for conflict exists between Dr. Thompson and the putative class and/or between Dr. Thompson and Mr. Yormak.  Further, the Court cannot determine if any potential conflict is fundamental.  Therefore, absent a greater showing, the Court finds that Dr. Thompson cannot meet his burden of demonstrating that he is an adequate class representative.  Moreover, even if Dr. Thompson does not proceed as a class representative, he would nevertheless be a member of the proposed class.  If the potential exists for a fundamental conflict between putative class counsel, Mr. Yormak, and Dr. Thompson as a named Plaintiff and a putative class member, then Mr. Yormak's ability to adequately represent the class in its entirety is questionable.[12] None of the briefing submitted to the Court explains how the Court can deem Dr. Thompson adequate as a putative class representative or Mr. Yormak adequate as putative class counsel under these circumstances.

Based on the foregoing, the Court finds that Plaintiffs Stephanie Lawrence and Dr. Jerald Thompson fail to satisfy the adequacy requirement with respect to their own adequacy to represent the putative class.  Moreover, even though Plaintiffs Gittens and Towns may be adequate class representatives under these circumstances, the Court cannot find that putative class counsel is adequate to represent the interests of all putative class members if a class were to

---

[12]  Contemporaneously with the entry of this Report and Recommendation, the Court has entered an order denying counsel's motion to withdraw without prejudice to being refiled after entry of an order by the presiding District Judge resolving the Report and Recommendation after the objection period.  This will require putative class counsel to continue to represent the interests of Dr. Thompson and the rest of the putative class until such time as the class certification issues are fully resolved by the presiding District Judge.

27

be certified.  The net result of these considerations is that Plaintiffs fail to satisfy the adequacy requirement under Rule 23(a)(4).

**B.    Rule 23(b) Requirements**

Once all of the requirements of Rule 23(a) are met, then the party seeking class certification must satisfy one of the requirements of Rule 23(b).  *Valley Drug Co.*, 350 F.3d at 1188.  Even though the Court finds that Plaintiff failed to satisfy many of the Rule 23(a) prerequisites, the Court will continue with its analysis under Rule 23(b).  Plaintiffs assert that their racial discrimination claim is maintainable under both Fed. R. Civ. P. 23(b)(1) and 23(b)(3).  (Doc. 34 at 15).  Notably, Plaintiffs move for class certification under Fed. R. Civ. P. 23(b)(1), but they fail to explain whether they are proceeding under Rule 23(b)(1)(A) or (B).  (*See* Doc. 34 at 16).

The Court will discuss each relevant subsection of Rule 23(b) in turn.

**1.    Rule 23(b)(1)(A)**

Rule 23(b)(1)(A) provides "for class adjudication where there is a risk that conflicting or varying judgments in separate lawsuits would establish incompatible standards of conduct for the party opposing the class."  *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1195 (11th Cir. 2009) (citing Fed. R. Civ. P. 23(b)(1)(A)).  One bar to certification under Rule 23(b)(1)(A) is when compensatory damages are requested.  *Id.*  Seeking compensatory damages lowers the risk of incompatible standards of conduct to such a degree that class certification is precluded.  *Id.*  Moreover, when a plaintiff requests both compensatory and injunctive relief, certification is improper under Rule 23(b)(1)(A).  *Id.*  Thus, only actions seeking declaratory or injunctive relief may be certified under Fed. R. Civ. P. 23(b)(1)(A).  *Id.*  In the instant case, Plaintiff requests

both compensatory damages as well as injunctive relief.  (*See*, *e.g.*, Doc. 39 at 21, 23-24).  Thus, certification under Fed. R. Civ. P. 23(b)(1)(A) is improper.

## 2.      Rule 23(b)(1)(B)

Plaintiffs argue that the School District's racial discrimination in the hiring of African-Americans "to the AP Pool" impacts each class member similarly and raises the same questions of law.  (Doc. 34 at 16).  Plaintiffs claim that any decision regarding whether the School District's policies violate Florida law would necessarily affect the interests of the other class members.  (*Id.*).  Plaintiffs conclude that there is a risk that if each African-American applicant were to litigate separately, then varying outcomes would result regarding the School District's alleged illegal conduct.  (*Id.*).

The School District argues in response that the claims raised are disparate treatment claims that, at their core, require individualized analysis.  (Doc. 44 at 16).  Thus, the School District contends that Plaintiffs failed to establish that an adjudication of their claims would be dispositive of the interests of other members of the class.  (Doc. 44 at 15-16).

Under Rule 23(b)(1)(B), a class action may be maintained if:

adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1)(B).

The types of cases brought pursuant to Rule 23(b)(1)(B) are illustrated as follows:

Rule 23(b)(1)(B) speaks from "a vantage point within the class, [from which the Advisory Committee] spied out situations where lawsuits conducted with individual members of the class would have the practical if not technical effect of concluding the interests of the other members as well, or of impairing the ability of the others to protect their own interests."  . . .  Thus, the subdivision (read with subdivision (c)(2)) provides for certification of a class whose members have no right to withdraw, when "the prosecution of separate actions . . . would create a

risk" of "adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." . . . Classic examples of such a risk of impairment may, for example, be found in suits brought to reorganize fraternal-benefit societies, . . . actions by shareholders to declare a dividend or otherwise to "fix [their] rights," . . . and actions charging "a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class" of beneficiaries, requiring an accounting or similar procedure "to restore the subject of the trust." . . . In each of these categories, the shared character of rights claimed or relief awarded entails that any individual adjudication by a class member disposes of, or substantially affects, the interests of absent class members.

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 833-34 (1999).

The claims raised here do not fall within these types of examples. As discussed, *supra*, adjudications with respect to each individual class member would not be dispositive of the interests of any other class member. Here, each putative class member's claim requires individualized analysis. Briefly – and it bears repeating – each school posted its own opening for assistant principal positions, each school chose the candidates to interview, each school conducted its own interviews, and each principal recommended an individual for the position. (*See* Doc. 44-1 at ¶ 8). Further, the adjudication for one individual class member would have no effect on any other individual class member's claim, nor would it prove another class member's claim for racial discrimination. Therefore, Plaintiffs fail to establish the requirements for class certification pursuant to Fed. R. Civ. P. 23(b)(1)(B).

### 3.    Rule 23(b)(3)

In the alternative, Plaintiffs contend that this class action satisfies the criteria set forth in Rule 23(b)(3). (*See* Doc. 34 at 17-18). To maintain a class action under Rule 23(b)(3) requires finding *both* (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

23(b)(3); *see also Vega*, 564 F.3d at 1277.  The Court will address the predominance and superiority requirements in turn.

a.      **Predominance**

To obtain Rule 23(b)(3) class certification, the issues in the class action that are subject to generalized proof and applicable to the class as a whole must predominate over those issues that are subject only to individualized proof. *Babineau*, 576 F.3d at 1191.  "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Williams*, 568 F.3d at 1357 (citation and quotations omitted).  The predominance inquiry is far more demanding that the commonality requirement of Rule 23(a). *Vega*, 564 F.3d at 1270 (citing *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000)).  The Eleventh Circuit described the test for predominance as:

> Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3). . . .  [I]f common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.  Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues (made relevant only through the inclusion of these new class members) are important.  If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

*Id.* (citation and quotation omitted).

To determine whether class or individual issues predominate, a court must take into account the claims, defenses, relevant facts, and applicable substantive law to assess the degree to which resolution of classwide issues will further each individual class member's claim against

31

the defendant.  *Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*, 458 F. App'x 793, 794 (11th Cir. 2012) (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir.2004), *abrogated in part on other grounds*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)).  The common issues will not predominate over individual questions if the "resolution of [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues."  *Bussey*, 562 F. App'x at 789 (quoting *Babineau*, 576 F.3d at 1191).  Moreover, certification is inappropriate if the "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims."  *Id.* (quoting *Klay*, 382 F.3d at 1255).

Plaintiffs assert that they are challenging the School District's policies of not hiring African-American applicants "for the AP Pool."  (Doc. 34 at 18).  Plaintiffs claim that common issues of law and fact are present given that the School District maintains policies that deprive Plaintiffs and putative class members of promotions because of racial discrimination.  (Doc. 34 at 18-19).  Thus, Plaintiff concludes that this common issue applies class-wide and will establish class-wide liability.  (*Id.* at 19).  Plaintiffs argue that "[s]ince it is the Defendant's policies that are at issue for liability, these common issues predominate over any individualized issue."  (Doc. 34 at 19).  Plaintiffs claim that individualized proof is not required to show whether the School District's policies violate Title VII and § 1981.[13]

The School District argues that each plaintiff's claim involves highly individualized issues regarding liability and damages.  (Doc. 44 at 19).  The School District contends that even

---

[13]  The named Plaintiffs again raise the issue of certifying a class under the Florida Civil Rights Act.  (*See* Doc. 34 at 19).  As stated, *supra* at footnote 5, Plaintiffs failed to allege a class action claim under the Florida Civil Rights Act.  (*See* Doc. 39 at 14-15).  Again, even if the Amended Complaint contained a claim for class certification under the FCRA, this claim would fail under Rule 23(b) for the same reasons as the Title VII and § 1981 claims fail.

if a class were established, each individual class member would have to show that he or she was qualified for the particular assistant principal position and that they would have received that position but for race.  (*Id.*).  The School Board points out that no two schools need identical assistant principals, schools have different needs, schools have different faculties and student populations, and schools have different requirements from state and federal agencies.  (*Id.*).  All told, the School District asserts that all of this information is considered to determine the best qualified individual for an open assistant principal position.  (*Id.*).  Further, the School Board asserts that each putative class member would have to overcome the reasons set forth by the School District as to why that particular individual was not hired by the specific decision-maker for the particular position, and then finally determine any compensatory damages if liability is found.  (*Id.*).  Finally, the School District claims that Plaintiffs failed to show any methodology that would permit the Court to assess damages on a class-wide basis.  (*Id.*).

Here, Plaintiffs must introduce a great deal of individualized proof to establish the elements of their individual claims.  *See Bussey*, 562 F. App'x at 789.  For each open assistant principal position, a plaintiff must first show that he or she was qualified for that particular position.  Thus, each plaintiff would need to present evidence as to their qualifications.  Even assuming, *arguendo*, that by being a member of the AP Pool, each plaintiff is generally qualified for an assistant principal position, the issue becomes what were the specific needs for the school with the open assistant principal position to which one of the Plaintiffs applied.  Moreover, based upon each school individually advertising its open assistant principal positions, screening the applicants, choosing whom to interview, conducting the interviews, choosing the top applicant, and then recommending that that applicant be hired, each plaintiff would have to prove as part of that individualized process that he or she was not hired because of race.  Thus, the hiring process

for each open position must be individually scrutinized to determine if racial discrimination occurred. Plaintiffs fail to explain how they would be able to prove racial discrimination in the hiring process of assistant principals on a class-wide basis without a highly individualized inquiry relating to each and every applicant for an open position during the relevant period. Based on these considerations, the Court finds that Plaintiffs cannot satisfy the predominance requirement because individualized issues will certainly predominate over any issues common to the class.[14]

### b.  Superiority

The second prong of Rule 23(b)(3) requires Plaintiffs to show that "a class action is superior to other available methods fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). For this prong, the focus "is not on the convenience or burden of a class action suit per se, but on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." Klay, 382 F.3d at 1269. As a result, the predominance analysis "has a tremendous impact on the superiority analysis of this [p]art for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." Id. Rule 23(b)(3) provides four specific considerations (though non-exclusive) pertinent to these findings:

> (A)   the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B)   the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

---

[14]  Based upon the Court finding that Plaintiffs failed to establish predominance as to liability, the Court need not address whether the issue of damages will require individualized proof as well. At a cursory look, it will.

(D)      the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

Plaintiffs argue that this case is "better resolved by a single adjudication, eliminating the need for duplicative suits to establish the same violation." (Doc. 34 at 23).  Plaintiffs claim that the proposed class members lack incentives to pursue individual actions as the possible recovery would likely be far outweighed by the expense of each individual action.  (*Id.*).  Moreover, Plaintiffs claim that it would be "far more efficient to have the common issues raised litigated in a single action, as opposed to many dozens or more individual actions."  (*Id.*).

Not surprisingly, the School District disagrees.  The School District contends that each individual claim has substantial value, including a potential of the statutory maximum of $300,000.00 each and the availability to recover attorney's fees, should a plaintiff prevail.  (Doc. 44 at 20).  Further, the School District again emphasizes that "individualized determinations necessary to establish liability and damages" predominate over common questions affecting the individuals and, thus, "the class action mechanism is not superior to other options for fair and efficient adjudication of the issues."  (Doc. 44 at 20).

In light of the Court's findings regarding the other Rule 23 criteria, Plaintiffs' contention that a class action is a superior method to adjudicate Plaintiffs' claims is unpersuasive.  Given the vast number of individualized issues that would have to be established to determine whether race discrimination occurred as to each individual plaintiff and class member, a class action is not a superior method of adjudicating Plaintiffs' claims.

## III.   Conclusion

For the reasons stated herein, the Court concludes that Plaintiffs have not met their burden under Fed. R. Civ. P. 23(a), 23(b)(1), and 23(b)(3) to show that class certification is

appropriate.  Specifically, Plaintiffs failed to demonstrate the sufficiency of the proposed class definition, the ascertainability of the putative class, adequacy, commonality, typicality, and the Rule 23(b) requirements.

Accordingly, it is **RESPECTFULLY RECOMMENDED**:

That the Motion to Certify a Class Action Pursuant to Rule 23(B)(1) and (3) (Doc. 34) be **DENIED**.

Respectfully recommended in Chambers in Ft. Myers, Florida on July 7, 2017.

MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:

Counsel of Record
Unrepresented Parties